IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 29, 2018 Session

## IN RE: KYLEA K.[1]

**Appeal from the Chancery Court for Washington County
No. 43983      John C. Rambo, Chancellor**

### No. E2017-02097-COA-R3-PT

This appeal involves the termination of a father's parental rights. The trial court found that grounds existed to terminate parental rights based on a prior adjudication of severe child abuse and abandonment by willful failure to visit and support. The trial court also found, by clear and convincing evidence, that termination was in the best interest of the child. The father appeals. We vacate the trial court's finding regarding one ground for termination but otherwise affirm the order terminating parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated in part, Affirmed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., J., and D. MICHAEL SWINEY, C.J., joined.

Adam J. Haselsteiner, Johnson City, Tennessee, for the appellant, Michael M.

Harry Curtis Williams, Johnson City, Tennessee, for the appellee, Crystal S.

Michelle Lee Caggiano, Johnson City, Tennessee, *Guardian ad Litem*.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Kylea was born in Tennessee in September 2015. Her parents were unmarried and had recently moved to Tennessee from Chicago. Due to drug exposure in the womb,

---

[1] In cases involving a minor child, it is this Court's policy to redact names in order to protect the child's identity.

Kylea was born with neonatal abstinence syndrome and went through drug withdrawals after birth.

Kylea's father ("Father") was in jail during most of the pregnancy and when Kylea was born, after he pled guilty to possession of methamphetamine, possession of Schedule IV controlled substances, possession of drug paraphernalia, and joyriding or unauthorized use of an automobile. Father was released from jail when Kylea was about two weeks old. According to Father, Kylea still remained hospitalized at that time because she was born drug-exposed and required medication. According to Father, he became very close with Kylea and stayed in the hospital with her and Kylea's mother as Kylea went through the period of withdrawal.

At some point, Kylea was discharged from the hospital and lived with both parents for about one month. Around November 2015, Father moved out of the home because his relationship with Kylea's mother deteriorated. According to Father, he continued to visit Kylea and provide her mother with diapers, formula, and baby supplies.

On December 1, 2015, when Kylea was two months old, Father accepted a position as a technician with a company that required him to travel to various locations around the country for the construction of cell phone sites and antenna systems. He spent the next several months in Orlando. Kylea remained in Tennessee with her mother. Father earned $25 per hour plus overtime pay, and his employer also provided him with hotel accommodations and per diem compensation. He continued to send money and packages to Kylea's mother from Orlando.

In February 2016, the Tennessee Department of Children's Services filed a petition seeking to have Kylea adjudicated dependent and neglected. According to the petition, DCS had received a referral alleging a drug exposed child after a domestic dispute between Kylea's mother and grandmother. Mother left the home where she was residing and moved into a homeless shelter. Kylea was reportedly found at another home, which smelled of marijuana, and various relatives at the home either tested positive for drugs or admitted to using them.

DCS attempted to locate other suitable relatives and eventually contacted a second cousin of Kylea's mother (an unmarried female in her twenties) who agreed to care for five-month-old Kylea. Although Father had not taken any steps to establish paternity of Kylea, DCS contacted him in Orlando via telephone. Father verbally agreed for the cousin ("Cousin") to have temporary custody of Kylea. According to Father, Kylea's

2

mother was supposed to enter rehabilitation, and he expected that Kylea would be returned to her thereafter. On February 25, 2016, the juvenile court of Washington County entered a protective custody order placing temporary custody of Kylea with Cousin. On March 9, 2016, a hair follicle drug screen was administered to Kylea, and the test indicated that Kylea had been exposed to THC and cocaine within the last ninety days.

Father called Cousin at least three times while Father continued to work in Orlando. He sent Cousin one money order for $100 to buy diapers. Father returned to Tennessee on March 15, 2016. He spoke with Cousin one or two more times by telephone and exchanged text messages with her, but he did not have any visits with Kylea or send additional support.

Kylea's mother was homeless and relapsed into drug use, and she stipulated that Kylea was dependent and neglected. Father initially participated in the dependency and neglect proceeding with an appointed attorney, but Father failed to appear at the adjudicatory hearing on July 21, 2016. His attorney moved to withdraw due to Father's failure to maintain contact with him. According to the juvenile court's adjudicatory order, DCS caseworkers and service providers testified that Father refused to provide DCS with his contact information, refused to take drug screens, and failed to cooperate with DCS or service providers. Based on the evidence presented, including the positive drug test recently administered to Kylea, the juvenile court found that Kylea was a dependent and neglected child and that Father and Kylea's mother had perpetrated severe child abuse upon Kylea by knowingly exposing the child to and knowingly failing to protect her from abuse and neglect, including exposure to such high levels of cocaine that she was metabolizing the substance in her body. The order placed full legal custody of Kylea with Cousin.

Two days before Kylea's first birthday, on September 12, 2016, Father was arrested after he was reportedly found "passed out" in a stolen vehicle with additional stolen property from a local business. Father was charged with burglary and theft over $10,000. Father pled guilty and remained in jail for several more months.

On October 20, 2016, Cousin filed a petition to terminate the parental rights of Father and Kylea's mother and to adopt Kylea. According to the petition, Kylea's mother had returned to Chicago and was believed to be homeless. Father remained in jail. The petition alleged that grounds for termination existed based on a prior adjudication of severe child abuse and abandonment by willful failure to visit and/or support. Kylea's

mother was served by publication, her parental rights were terminated on various grounds, and she is not a participant in this appeal, so we will not discuss the proceedings relating to her for purposes of this opinion.

The trial court appointed an attorney for Father and a guardian ad litem for Kylea. The termination trial was held on September 8, 2017, just days before Kylea's second birthday. Father had been released from jail about two weeks earlier, and he testified at trial. Cousin and her fiancé also testified. On September 11, 2017, the trial court entered an order terminating Father's parental rights on the grounds of a prior adjudication of severe child abuse and abandonment by willful failure to visit and support. The trial court found by clear and convincing evidence that it was in the best interest of Kylea to terminate Father's parental rights. Father timely filed a notice of appeal.

## II. ISSUES PRESENTED

Father lists the following issue for review on appeal: Did the Chancery Court of Washington County err as a matter of law in finding by clear and convincing evidence that grounds for termination of parental rights exist and that such termination is in the best interest of the child? Both Cousin and the guardian ad litem argue, in their respective briefs, that Father has waived consideration of any issues on appeal for failure to comply with the briefing requirements of this Court. Cousin also asks this Court to award her attorney's fees for defending against a frivolous appeal. For the following reasons, we vacate the trial court's finding regarding one possible ground for termination but otherwise affirm the trial court's order terminating parental rights and remand for further proceedings.

## III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

In Tennessee, proceedings to terminate parental rights are governed by statute. *In re Kaliyah S.*, 455 S.W.3d 533, 541 (Tenn. 2015). Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *Id.* at 546. Pursuant to the statute, parties who have standing to seek termination of parental rights must prove two elements. *Id.* at 552. First, they must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.*

Because of the constitutional dimension of the rights at stake in a termination

4

proceeding, the petitioner must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citing Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 808-09 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). "Clear and convincing evidence" has been defined as "'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Adoption of Angela E.*, 402 S.W.3d 636, 640 (Tenn. 2013) (quoting *In re Valentine*, 79 S.W.3d at 546). It produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established. *In re Bernard T.*, 319 S.W.3d at 596.

Due to the heightened burden of proof in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Adoption of Angela E.*, 402 S.W.3d at 639. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. Waiver

At the outset, we note the issues raised by both Cousin and the guardian ad litem regarding the deficiencies in Father's brief on appeal. Father's brief does not contain a single citation to the record on appeal, and, perhaps as a result, it contains numerous misstatements of fact. Father's brief cites a total of four cases, but only one case was properly cited with a full case citation.

Because of the fundamental parental rights at stake in parental termination cases, the Tennessee Supreme Court has held that "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26. The supreme court expressly stated that it had "no desire to

encourage attorneys to raise frivolous issues in any appeal" or "to prolong the resolution of parental termination proceedings." *Id.* at 525. Interestingly, the supreme court also added that "the Court of Appeals may adopt a rule requiring parents to brief these issues in every appeal." *Id.* at 526 n.16. At the same time, however, the court stated unequivocally that "the Court of Appeals *must* review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, *regardless* of whether the parent challenges these findings on appeal." *Id.* at 525-26 (emphasis added).

As a result, even when faced with woefully deficient briefs on appeal that fail to comply with the Rules of this Court or the Rules of Appellate Procedure, this Court has proceeded to perform a de novo review of trial court decisions terminating parental rights as instructed by *Carrington*. *See, e.g.*, *In re Mya V.*, No. M2016-02401-COA-R3-PT, 2017 WL 3209181, at *3 (Tenn. Ct. App. July 28, 2017) (*no perm. app. filed*). We proceed with such review in this appeal despite the deficiencies in Father's brief.

## B. Grounds for Termination

### 1. Severe Child Abuse

Tennessee Code Annotated section 36-1-113(g)(4) provides that a ground for terminating parental rights exists if:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, *under any prior order of a court **or** is found by the court hearing the petition* to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]

(Emphasis added.) The juvenile court's 2016 order finding that Father committed severe child abuse against Kylea, as defined by Tenn. Code Ann. § 37-1-102, was not appealed and became a final order of the court.

The only argument Father raises on appeal regarding this ground for termination relates to whether he knowingly exposed Kylea to drugs, when he was working out of

town at the time, so as to constitute severe child abuse. Essentially, he seeks to relitigate the issue of severe child abuse and argues that the trial court erred in relying on the juvenile court's prior adjudication of severe child abuse instead. However, "'[o]nce there has been a finding of severe child abuse in a final order, the doctrine of res judicata prevents parents from re-litigating the issue of whether they committed severe child abuse in a subsequent proceeding to terminate their parental rights.'"[2] *In re C.D.*, No. M2016-00275-COA-R3-PT, 2016 WL 4548042, at *5 (Tenn. Ct. App. Aug. 30, 2016) (quoting *In re Joshua C.*, No. E2016-00081-COA-R3-PT, 2016 WL 4069288, at *3 (Tenn. Ct. App. July 28, 2016)). This Court has repeatedly applied the doctrine of res judicata to prevent a parent from re-litigating whether he or she committed severe child abuse in a termination of parental rights proceeding when such a finding has already been made in a previous dependency and neglect action. *See, e.g.*, *In re Heaven L.F.*, 311 S.W.3d at 439; *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012).

"It is well settled that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and is not required to re-litigate the issue of severe abuse during the termination trial, so long as the prior order is final." *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *6 (Tenn. Ct. App. May 23, 2018) (citing *In re Shyronne D.H.*, No. W2011-00328-COA-R3-PT, 2011 WL 2651097, at *5 (Tenn. Ct. App. July 7, 2011); *State, Dep't of Children's Servs. v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)).

> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. . . . The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011) (quotation omitted). "[I]f there is a finding of severe child abuse, . . . one ground for termination of the parent's parental rights is effectively established." *Id.* Because the juvenile court's 2016 unappealed final order found that Father committed severe child abuse against Kylea, this ground for terminating Father's parental rights has been established.

---

[2] Under the doctrine of *res judicata*, "'an existing final judgment rendered upon the merits, without fraud or collusion, by a court of competent jurisdiction, is conclusive of the rights, questions and facts in issue as to the parties and their privies, in all other actions in the same or any other judicial tribunal of concurrent jurisdiction.'" *In re Heaven L.F.*, 311 S.W.3d 435, 439 (Tenn. Ct. App. 2010) (quoting *Galbreath v. Harris*, 811 S.W.2d 88, 90 (Tenn. Ct. App. 1990)).

The termination statute provides that termination of parental rights "may be based upon any of the grounds listed in [ ] subsection (g)." Tenn. Code Ann. § 36-1-113(g). In other words, "the existence of any one ground for termination is enough." *In re M.A.A.K.*, No. E2010-01318-COA-R3-PT, 2010 WL 4342154, at *4 (Tenn. Ct. App. Nov. 3, 2010). However, due to the supreme court's instruction in *Carrington*, we must also review the other grounds that were at issue in this case.

## 2.    Abandonment

Pursuant to the termination statute, another ground for termination exists if "[a]bandonment by the parent or guardian, as defined in § 36-1-102, has occurred." Tenn. Code Ann. § 36-1-113(g)(1). Tennessee Code Annotated section 36-1-102 provides five alternative definitions of abandonment. A specific definition applies if the parent "is incarcerated at the time of the institution of an action" or "has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action[.]" Tenn. Code Ann. § 36-1-102(1)(A)(iv). Father was incarcerated at the time the petition was filed. Accordingly, we apply the definition in subsection (iv), which provides that abandonment occurs if the parent "either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's [] incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv).[3]

Father began his period of incarceration on September 12, 2016. Therefore, the relevant four-month period spanned from May 12 to September 11, 2016.[4] To briefly recap, Kylea went to live with Cousin on February 18, 2016, when DCS became involved after the domestic dispute between her mother and grandmother, when Father was working in Orlando. Thereafter, Father sent one money order to Cousin for $100 around the end of February, but nothing else. Father was earning $25 per hour during that time, in addition to receiving per diem compensation and employer-provided hotel lodging.

---

[3] We note that the petition for termination alleged that Father was in jail but referenced the statutory definition of abandonment for non-incarcerated parents, regarding willful failure to visit or support during the four month period preceding the filing of the petition. No one mentioned this discrepancy on appeal, and we conclude that the proper definition of abandonment was applied by the trial court after trial by consent. *See In re D.H.B.*, No. E2014-00063-COA-R3-PT, 2015 WL 1870303, at *5 (Tenn. Ct. App. Apr. 23, 2015).

[4] *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (explaining the calculation of the four-month period).

8

Father returned to Tennessee on March 15, 2016. Father testified at trial that the juvenile court would not permit him to visit with Kylea because he had not established paternity. Father testified that he tried to contact Cousin to send her money after returning to Tennessee but that Cousin was "giving me a hard time about returning phone calls." Father's phone records reflected one successfully placed phone call from Father to Cousin during the four-month period at issue, and a second call marked "Abnormal Completion." Cousin testified that she did respond to Father's phone calls, except during her work hours when she was not allowed to be on her phone. Cousin also testified that when Father did call her, he was more concerned with asking about the whereabouts of Kylea's mother and "didn't ask about Kylea that often." The trial court found that Father made one phone call to Cousin during the relevant four-month period but that his contacts with Cousin focused on asking about Kylea's mother, and he did not show any detailed interest in Kylea. The trial court found that "Father was unpersuasive that [Cousin] was difficult to contact or that she made it difficult for him to provide her with money."

Father apparently remained employed after returning to Tennessee, as he testified at trial that he declined to take a drug test when DCS visited his residence because he was running late for work. He also testified that before Cousin filed the termination petition, he "was out of town working a lot and my income was good." However, the details of his employment during the critical four-month period from May to September 2016 are surprisingly sparse. Aside from these isolated references to Father "working" after he returned to Tennessee, we have no details in the record regarding where Father was employed, the amount of money he earned, the number of hours he was working, the expenses and obligations Father had, or the assets that were available to him. Father testified that the juvenile court appointed an attorney for him in the dependency and neglect proceeding that was pending when he returned to Tennessee.

Defining abandonment as the mere non-payment of support, irrespective of intent, would be unconstitutional. *See In re D.L.B.*, 118 S.W.3d at 367. As such, the "financial ability, or capacity, of a parent to pay support must be considered" when determining an element of willfulness. *In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *14 (Tenn. Ct. App. Sept. 22, 2016), *perm. app. denied* (Tenn. Dec. 16, 2016). "If failure to support [] is due to circumstances outside of a parent's control, then he or she cannot be said to have willfully abandoned the child." *In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *7 (Tenn. Ct. App. Mar. 23, 2015) (citing *In re Adoption of Angela E.*, 402 S.W.3d at 640).

The relevant statutes require a willful failure to support or to make reasonable payments toward the child's support, meaning, a willful failure to provide monetary

support or more than token payments toward the support of the child. Tenn. Code Ann. § 36-1-102(1)(D). Token support is support that "under the circumstances of the individual case, is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). A finding that support was "insignificant" in light of the parent's "means" cannot be made without evidence regarding both a parent's actual financial support of the child *and* a parent's "means." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *10 (Tenn. Ct. App. June 3, 2003); *see also In re Malaki E.*, No. M2014-01182-COA-R3-PT, 2015 WL 1384652, at *7 (Tenn. Ct. App. Mar. 23, 2015) ("The court must review a parent's means[.]"). In this context, "the word 'means' connotes both income and available resources for the payment of debt." *In re Adoption of Angela E.*, 402 S.W.3d at 641 (citation omitted).

The Tennessee Supreme Court's decision in *In re Adoption of Angela E.*, 402 S.W.3d at 641, is instructive on the issue of willful failure to support. In that case, the Tennessee Supreme Court found that the petitioners failed to provide clear and convincing evidence of willful failure to support when there was no evidence presented concerning the defendant-father's monthly expenses, even though he was employed as a physician earning an annual income of $150,000 and owned lien-free property worth at least $300,000. *Id.* The supreme court found the evidence regarding the father's income and expenses "limited at best" and deemed the evidence insufficient. *Id.* The court reiterated that, in order to prove the ground of abandonment for failure to support, the petitioner "must prove by clear and convincing evidence that the [parent who failed to support] had the capacity to pay support but made no attempt to do so and did not possess a justifiable excuse." *Id.* Thus, *In re Adoption of Angela E.* illustrates "the significance of evidence concerning a parent's income and expenses when the ground of abandonment by willful failure to support is alleged." *In re Navada N.*, 498 S.W.3d 579, 594 (Tenn. Ct. App. 2016).

Here, the trial court found that Father had construction skills that allow him to make money and that he was earning $25 per hour as recently as February 2016 (prior to the four-month period). The trial court found "no explanation" for why Father was not supporting the child during the summer of 2016 and no proof that he was unable to work. However, the burden was not on Father to demonstrate an inability to work or pay. The burden to prove abandonment by willful failure to support rests on the petitioner. "[W]e cannot fault a parent for the absence of evidence regarding his or her financial situation." *In re James V.*, No. M2016-01575-COA-R3-PT, 2017 WL 2365010, at *5 (Tenn. Ct. App. May 31, 2017) (*no perm. app. filed*). In a termination case, "[t]he burden is not on the parent to demonstrate an inability to pay; the burden is on the petitioner to prove by clear and convincing evidence that the parent had the capacity to pay, made no attempt to do so, and had no justifiable excuse for not doing so." *Id.* (citing *In re Adoption of*

10

*Angela E.*, 402 S.W.3d at 641). The burden is on the petitioner "to illicit lucid and intelligible evidence regarding [the parent's] ability to pay support and whether [his or] her failure to do so was justified so as to remove any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Destiny H.*, No. W2015-00649-COA-R3-PT, 2016 WL 722143, at *10 (Tenn. Ct. App. Feb. 24, 2016) (*no perm. app. filed*) (quoting *In re Valentine*, 79 S.W.3d at 546). "A trial court cannot be left to speculate about this important element of failure to support." *In re L.J.*, No. E2014-02042-COA-R3-PT, 2015 WL 5121111, at *7 (Tenn. Ct. App. Aug. 31, 2015).

Having reviewed the evidence presented and the trial court's findings, we conclude that the record contains insufficient evidence to demonstrate, clearly and convincingly, that Father had the capacity to pay child support during the relevant period and willfully failed to do so. We have no proof to establish Father's employment, income, expenses, or resources during the critical four-month period. Given the issues at hand, this is a critical gap in the evidence that we cannot overlook. "Without such evidence, a finding of willfulness cannot be sustained." *In re Navada N.*, 498 S.W.3d at 600. "[A] court can only determine willfulness of a parent's failure to support where there is sufficient evidence regarding the parent's ability to pay." *In re Jamie G.*, No. M2014-01310-COA-R3-PT, 2015 WL 3456437, at *15 (Tenn. Ct. App. May 29, 2015) *perm. app. denied* (Tenn. Aug. 28, 2015); *see, e.g., In re Destiny H.*, 2016 WL 722143, at *10 ("[the] evidence concerning Mother's employment does not provide sufficient insight into her total income earned or her expenses during the relevant four-month period so as to provide clear and convincing evidence that any failure to support was willful"). We hereby vacate the trial court's finding regarding failure to support.

As noted above, abandonment can also be demonstrated by willful failure to visit. Failure to visit is willful when a parent knows of his or her duty to visit, has the capacity to do so, makes no attempt to do so, and does not have a justifiable excuse for not doing so. *In re Audrey S.*, 182 S.W.3d at 864. In the case at bar, Father did not visit Kylea during the relevant four-month period. Father testified that the juvenile court did not grant him visitation with Kylea because he had not established paternity. He testified that the juvenile court informed him that DNA testing would be performed but that DCS never told him when or where to go. Cousin testified that she took Kylea for the DNA test and that her caseworker informed her that Father never showed up. The adjudicatory order from juvenile court stated that Father refused to provide his contact information to DCS, failed to maintain contact with DCS, and did not cooperate with them. The trial court found that Father's paternity was only confirmed after Cousin paid for a paternity test at her own expense, during this proceeding, and that Father "was unresponsive and disinterested in making the effort to prove his paternity prior to this case." The trial court found that Father never proactively attempted to establish paternity, which would have

triggered visitation for him, and "willingly [forewent] his opportunity to assume fatherly responsibilities." The trial court also discredited Father's testimony that Cousin was difficult to contact. Giving due deference to the trial court's credibility determinations, we cannot say that the evidence preponderates against the trial court's factual findings. We conclude that the evidence clearly and convincingly shows that Father willfully failed to visit Kylea during the relevant four-month period prior to his incarceration. Therefore, grounds for termination existed based on abandonment by willful failure to visit.

### C.    Best Interest

Because the trial court properly found at least one ground for termination, we must review the trial court's finding that termination of parental rights is in the best interest of Kylea. Tennessee Code Annotated section 36-1-113(i) provides a list of factors that are relevant when deciding what is in a child's best interest. However, the list is not exhaustive, and the court is not required to find the existence of every factor before concluding that termination is in a child's best interest. *In re Joseph F.*, 492 S.W.3d 690, 706 (Tenn. Ct. App. 2016). "The child's best interests must be viewed from the child's, rather than the parent's, perspective." *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004). "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Jacobe M.J.*, 434 S.W.3d 565, 573 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-101(d)).

On appeal, Father argues that the record contains no evidence to support a finding that the child's best interest would be served by terminating his rights. He claims that his actions "were never inconsistent with that of a fit parent, except during the period he was incarcerated." He insists that there is "no evidence to suggest criminal activity or substance abuse in [his] home." Father claims that he "has not yet had the opportunity to parent the child for a period of time significant enough to demonstrate that he is an unfit parent." He argues that because Kylea is only two years old, "[she] is young enough that a change in environment would not be detrimental to her emotional, psychological, or medical health." The record, however, simply does not support Father's assertions regarding the best interest of the child.

Kylea was five months old when she was placed with Cousin, and she was days away from her second birthday at the time of trial. When Kylea was initially placed with Cousin, she was behind on her vaccinations and still suffering the effects of drug withdrawal, with shaking and unusual crankiness. Kylea was initially determined to be delayed but after participating in Tennessee Early Intervention Services she began

meeting the necessary milestones. Despite these improvements, Kylea still had some issues with shaking, nervousness, and possible night terrors. Kylea called Cousin "Mom" and Cousin's fiancé "Dad." Cousin testified that Kylea was very closely bonded with her family and believed that it would be detrimental to place her with Father -- essentially a stranger to Kylea. Father had not seen Kylea since before he left for Florida when she was two months old. While Kylea was residing with Cousin, Father was uncooperative with DCS and continued to engage in criminal activity. As the trial judge put it, Father was "unresponsive and disinterested in making the effort to prove his paternity prior to this case" and failed to make "reasonable efforts to provide a home for [Kylea]." Father was released from jail most recently about two weeks before trial, and he conceded at trial that he had been in jail for about half of Kylea's life. Father mentioned the idea of taking Kylea "up North" and raising her with a sister there, but he admitted that his parental rights to the sister had been terminated and that she had been adopted. We agree with the trial court that Father has not demonstrated any propensity to care for a child. Despite Father's argument to the contrary, a change of caretakers at this point would likely have detrimental effects on this two-year-old girl. We conclude that the evidence clearly and convincingly demonstrates that termination of Father's parental rights is in the best interest of Kylea.

### D.    Attorney's Fees

Finally, we consider Cousin's request for attorney's fees on appeal. She argues that this appeal was frivolous and that it provides a basis for granting her attorney's fees pursuant to Tennessee Code Annotated section 27-1-122, which provides:

> When it appears to any reviewing court that the appeal from any court of record was frivolous or taken solely for delay, the court may, either upon motion of a party or of its own motion, award just damages against the appellant, which may include but need not be limited to, costs, interest on the judgment, and expenses incurred by the appellee as a result of the appeal.

Tenn. Code Ann. § 27-1-122. "A frivolous appeal is one that is devoid of merit or has no reasonable chance of success." *Selitsch v. Selitsch*, 492 S.W.3d 677, 690 (Tenn. Ct. App. 2015). "The decision to award damages for the filing of a frivolous appeal rests solely in the discretion of this Court." *Chiozza v. Chiozza*, 315 S.W.3d 482, 493 (Tenn. Ct. App. 2009). "In considering a request for attorney's fees on appeal, we consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other equitable factors relevant in a given case."

*In re Estate of Morris*, No. M2016-02557-COA-R3-CV, 2017 WL 5304464, at *7 (Tenn. Ct. App. Nov. 13, 2017), *perm. app. denied* (Tenn. Mar. 15, 2018) (citing *Moran v. Wilensky*, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010)). We exercise our discretion to award such fees "sparingly so as not to discourage legitimate appeals." *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017) (quotations omitted). At the same time, however, the frivolous appeal statute "reflect[s] the view that successful parties should not have to bear the costs and vexation of baseless appeals," nor should appellate courts "be saddled with such cases." *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 342 (Tenn. 2010) (quotations omitted). In sum, "imposing a penalty for a frivolous appeal is a remedy which is to be used only in obvious cases of frivolity and should not be asserted lightly or granted unless clearly applicable—which is rare." *Id.*

In *In re M.L.D.*, 182 S.W.3d 890, 898 (Tenn. Ct. App. 2005), this Court stated,

> The determination of whether a parent's rights to his/her child should be terminated is the most serious and grave issue to be addressed by this Court. Accordingly, we are loathe to consider an appeal of a trial court's judgment terminating a parent's rights to be frivolous.

We went on to *award* frivolous appeal damages in that case, however, where the appellant was the petitioner rather than the parent, and the appellant failed to provide an adequate record for review on appeal. *Id.*

At trial, Cousin testified that Father sent her a text message calling the court proceeding "a chess game" for which he was planning his next move. Noting this testimony, the guardian ad litem suggests that Father similarly pursued this appeal in an effort to harass Cousin and delay permanency for the child. Notably, Father pursued an appeal to this Court despite the fact that the trial court based its decision to terminate his parental rights, in part, on the ground of a prior adjudication of severe child abuse. Father's argument regarding the ground of severe child abuse was totally devoid of merit and had no reasonable chance of success. And, only one ground is necessary to support termination of parental rights. Still, we cannot say that Father's argument regarding the best interest of the child was so utterly devoid of merit as to be frivolous. We respectfully decline to award Cousin her attorney's fees on appeal.

14

## V. Conclusion

For the aforementioned reasons, the decision of the chancery court is hereby vacated in part and affirmed in part and remanded for further proceedings. Costs of this appeal are taxed to the appellant, Michael M. Because Michael M. is proceeding *in forma pauperis* in this appeal, execution may issue for costs if necessary.

_____
BRANDON O. GIBSON, JUDGE